# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**SYLVIA E. BEVERLIN,**

      **Plaintiff,**

**v.**                                     **Civil Action No.: 5:15cv15**
                                           **(The Honorable Frederick P. Stamp, Jr.)**


**CAROLYN W. COLVIN,**
**Acting Commission of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Sylvia E. Beverlin ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) for judicial review of the final decision of the defendant, Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment[1] and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. §§ 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff filed her application for DIB on February 6, 2013, alleging disability beginning on December 8, 2008.[2] Plaintiff's application was denied at the initial and reconsideration levels. Plaintiff thereafter requested a hearing, which Administrative Law Judge Jeffrey J. Schueler

---

[1] The Court wishes to remind Plaintiff's counsel that according to the Local Rule 9.02(e) he needs the Court's approval before filing a memorandum exceeding the fifteen page number limit.
[2] Plaintiff previously filed for DIB and was denied at the initial level on May 22, 2007. Plaintiff subsequently appealed this denial through an ALJ decision dated September 11, 2008, and up to the Appeals Council.

("ALJ") held on July 24, 2015, and at which Plaintiff, represented by counsel, and Mr. Mark Hileman, an impartial Vocational Expert ("VE"), testified. On September 19, 2014, the ALJ entered a decision finding Plaintiff was not disabled. Plaintiff appealed this decision to the Appeals Council and, on December 14, 2014, the Appeals Council denied Plaintiff's request for review thus making the ALJ's decision the final decision of the Commissioner.

## II. FACTS

### A. Personal History

Plaintiff was born on October 2, 1958, and was fifty-five (55) years old and married with a twenty-six (26) year old daughter at the time of the administrative hearing (R. 31). She has a high school diploma and the only higher education courses she has taken were through mail-order to become a certified dietary manager. Id. Plaintiff last worked in 2004. Id.

### B. Medical History Summary

#### 1. Medical History Pre-Dating December 8, 2008

Plaintiff went to Dr. John Blanco, M.D., on March 23, 2007, for low back pain (R. 501). Following examination, Dr. Blanco indicated that Plaintiff had degenerative disc disease at the L5-S1 vertebrae. Id.

On April 6, 2007, Plaintiff reported to Dr. R. Craig Platenberg, M.D., for back and bilateral leg pain (R. 500). After examining Plaintiff's MRI, Dr. Platenberg concluded that she suffered from a "small central, noncompressive L4-L5 disc herniation" but with no nerve root deviation or dilation. Id. In addition, Dr. Platenberg noted "right-sided L5-S1 foraminal narrowing" with a disc bulge complex. Id.

On September 15, 2008, Plaintiff saw Dr. Cherry Lobaton, M.D., for her evaluation of her test results. Review of her bodily systems revealed no negative symptoms (R. 262). Physical

exam revealed normal readings except that Dr. Lobaton diagnosed Plaintiff as moderately obese with moderate tachycardic (R. 263).

Plaintiff visited Dr. Lobaton on October 8, 2008, again complaining of joint pain (R. 265). Plaintiff reported experiencing stiffness and pain in hips, fingers, wrists, elbows, and neck. Id. Plaintiff stated that she could perform household chores still. Id. Review of her bodily systems revealed positive symptoms for back pain and joint stiffness. Id. Physical exam revealed musculoskeletal pain with range of motion in the hips (Doc. No. 267).

### 2. Medical History Post-Dating December 8, 2008

On December 9, 2008, Plaintiff met with Dr. Michael M. Rezaian, M.D., complaining of joint pain (R. 311). Plaintiff complained of pain and stiffness in her wrists, hands, ankles, feet, elbows, shoulders, hips, back, and neck. Id. Plaintiff reported that her pain increased throughout the day, but improves with rest. Id. She stated that her pain has gotten worse over the last year and a half. Id. Joint exam revealed tenderness and swelling at her wrists, elbows, shoulders, hips, knees, and ankles (R. 313). However, Dr. Rezaian also noted good range of motion for her elbows and hips. Id. Dr. Rezaian prescribed more pain medication (R. 314).

Plaintiff had an MRI conducted on December 9, 2008, by Dr. Blanco (Doc. No. 296). Radiographs showed no fracture, no bone degenerative change, or no bone lesions in her hip/pelvis region. Id. MRI of her spine revealed degenerative disc disease at the L5-S1 vertebra (R. 297). MRI of her knees showed no evidence of fracture, dislocation, or other bone abnormality (R. 426). Additionally, her joint spaces appeared normal and no evidence of joint effusion was present. Id.

On December 10, 2008, Plaintiff returned to Dr. Lobaton presenting mixed hyperlipidemia related to her type II diabetes (Doc. No. 268). Review of her bodily symptoms

revealed no negative symptoms. Id. Besides the obesity, physical exam revealed no negative findings (R. 269). Dr. Lobaton recommended more lab tests to control her diabetes (R. 271).

On December 22, 2008, Plaintiff returned to Dr. Rezaian for left leg and joint pain (R. 315). Plaintiff reported her pain as moderate to severe (R. 316). Review of systems revealed no negative symptoms. Id. Joint exam revealed tenderness and swelling at wrists, elbows, shoulders, hips, knees, and ankles (R. 317). Dr. Rezaian noted that her arthritis remained active (R. 315).

On January 23, 2009, Plaintiff was admitted at the West Virginia University Hospital in Martinsburg, West Virginia, for an endoscopy and colonoscopy (R. 259). She was discharged with the following diagnoses: (1) acute blood loss anemia; (2) query gastrointestinal bleed; (3) type 2 diabetes; (4) hypertension; (5) hyperlipidemia; and (6) osteoarthritis. Id.

On February 9, 2009, Plaintiff had a follow-up visit with Dr. Lobaton for her anemia (R. 272). Review of her bodily systems revealed no negative symptoms. Id. Physical exam revealed no negative findings (R. 273–74). Dr. Lobaton recommended more lab tests to monitor her lipid count (R. 274).

Plaintiff returned to Dr. Rezaian on February 20, 2009, complaining of pain, stiffness, and swelling in her hands, wrists, knees, shoulders, and feet (R. 319). Plaintiff notes that her pain is not overall getting worse. Id. She describes her pain as achy. Id. Review of her systems revealed no negative symptoms (R. 321). Joint exam revealed tenderness and swelling at her wrists, elbows, shoulders, hips, knees, and ankles (R. 322). Dr. Rezaian noted good range of motion in all those areas except for the hips and knees. Id.

Plaintiff reported back to Dr. Lobaton on March 10, 2009, regarding her diabetes (R. 275). Plaintiff denied feeling any signs of depression and diabetic related symptoms. Id. Review

of her bodily symptoms revealed no negative symptoms. Id. Physical exam revealed no negative findings; however, Dr. Lobaton noted that Plaintiff's obesity dropped to "mild" (R. 277).

Plaintiff returned to Dr. Rezaian on April 6, 2009, for pain all over her body (R. 323). Review of her systems revealed no negative findings (R. 325). Joint exam revealed tenderness and swelling (R. 326). Dr. Rezaian commented that Plaintiff's arthritis, along with her hand and foot joint swelling, seemed to be worsening (R. 323).

On June 4, 2009, Plaintiff visited Dr. Rezaian for joint paint (R. 328). Review of her systems and joint examination revealed nothing new except for the swelling and tenderness (R. 329–30). Dr. Rezaian noted that Plaintiff's arthritis remained unchanged (R. 327). He also noted that her elbows, knees, and other joints remained just as swollen and tender as before. Id.

On June 10, 2009, Plaintiff visited Dr. Lobaton complaining of sinus problems and palpitations (R. 279). Plaintiff reported having facial pressure along with shortness of breath. Id. Review of her bodily symptoms revealed no negative symptoms. Id. Physical examination revealed moderately swollen nasal cavities (R. 281).

On September 3, 2009, Plaintiff returned to Dr. Rezaian for joint pain (R. 333). Following examination, Dr. Rezaian noted that her arthritis remained the same in terms of joint swelling (R. 332). Additionally, her hand, wrist, and knee swelling remained unchanged. Id. Plaintiff's pain still continued despite treatment. Id. Dr. Rezaian predicted that Plaintiff has sciatica. Id. Review of her bodily systems revealed no negative symptoms (R. 335). Physical and joint examination remained the same (R. 335).

Plaintiff reported back to Dr. Lobaton on September 9, 2009, regarding her diabetes and mixed hyperlipidemia (R. 283). Review of her bodily systems revealed no negative symptoms.

Id. Physical exam revealed no negative findings (R. 285). Dr. Lobaton recommended more lab testing. Id.

On September 29, 2009, Plaintiff reported to Dr. Lobaton for cold symptoms and anxiety (R. 286). Plaintiff exhibited nasal congestion. Id. She also stated that she has been under a lot of stress recently and has not slept well. Id. Review of her bodily systems revealed nasal congestion, hoarseness, sore throat, cough, anxiety, stress, and sleep disturbance Id. Physical exam revealed no negative findings; however, psychiatric exam revealed a tearful affect/demeanor (R. 288).

On December 14, 2009, Plaintiff presented to Dr. Lobaton for diabetes evaluation (R. 289). Review of her bodily systems revealed no negative findings. Id. Physical exam only revealed that Plaintiff is classified as obese (R. 291).

On December 29, 2009, Plaintiff returned to Dr. Rezaian complaining of pain from the cold (R. 338). Plaintiff described her pain as achy and as moderate to severe. Id. Dr. Rezaian noted no significant change in her swelling following examination: hand, wrist, ankle, and foot swelling unchanged (R. 338). Dr. Rezaian opined that her shoulder pain was due to bursitis. Id. He also estimated that the hip pain is coming from trochanteric bursitis. Id.

Plaintiff returned to Dr. Rezaian on April 10, 2010, for pain over her body (R. 482). Dr. Rezaian noted no significant change in her arthritis or in her hand, ankle, and wrist swelling (R. 481). He continued to opine that her hip and shoulder pain was likely due to bursitis. Id.

On July 28, 2010, Plaintiff met with Dr. Rezaian again (R. 486). Dr. Rezaian reported that all tests regarding her arthritis and joint swelling remained unchanged from before. Id. In reviewing her bodily systems, Dr. Rezaian noted that Plaintiff had pain in her legs and had difficulty walking (R. 489).

On March 24, 2011, Plaintiff met with Dr. Rezaian (R. 491). Dr. Rezaian noted that treatment had helped improve her arthritis and the swelling in her joints. Id. Plaintiff herself stated that she was not as swollen as before (R. 492).

On January 28, 2012, Plaintiff visited Dr. Rezaian for pain (R. 378). She described her pain on a 1–10 scale as a 5. Id. After examination, Dr. Rezaian noted that Plaintiff's arthritis is overall stable with less swelling than before (R. 376). He also noted that her wrist, elbow, knee, and ankle swelling remained stabled and unchanged. Id.

On February 28, 2013, Plaintiff returned to Dr. Rezaian for joint pain (R. 372). Plaintiff complained of increasing pain describing it as aching and mild to severe as the day progresses. Id. On a 1–10 scale, Plaintiff described it as a 6. Id. Dr. Rezaian noted that her arthritis remained unchanged in terms of swelling (R. 370). Additionally, he reported that Plaintiff's hand, wrist, knee, and ankle swelling remained unchanged. Id.

On May 28, 2013, Plaintiff returned to Dr. Rezaian for a follow-up (R. 459). She continued to complain of swelling in her joints. Id. She rated her pain as a 5/10. Id. Following examination, Dr. Rezaian noted that her arthritis was getting worse than what was reported last exam (R. 457). Additionally, he reported that the swelling on her hand, wrist, knee, and ankle joints were worsening. Id. He also noted inflammatory back pain and bursitis. Id.

On August 26, 2013, Plaintiff met with Dr. Rezaian again for her joint pain (R. 461). She described her pain today as a 5/10 (R. 463). After examining her, Dr. Rezaian determined that Plaintiff's arthritis and her hand, wrist, and ankle swelling remained unchanged (R. 461). He also noted presence of bursitis in her shoulders. Id.

Plaintiff returned to Dr. Rezaian on October 25, 2013, for knee pain described as a 5/10 on the pain scale (R. 465). Dr. Rezaian noted that Plaintiff's arthritis showed overall worsening

compared to the last test. Id. Plaintiff's knee, wrist, and ankle swelling worsened as well. Id. Dr. Rezaian opined that Plaintiff's knee pain was caused by the inflammatory arthritis. Id.

On January 30, 2014, Plaintiff visited Dr. Rezaian again complaining of pain all over her body (R. 470). She still described the pain as a 5/10. Id. After examination, Dr. Rezaian noted that Plaintiff's arthritis had not improved (R. 469). He also stated that her hand, wrist, knee, and ankle swelling remained unchanged. Id. He further opined that Plaintiff's back, knee, and ankle pain was caused by her arthritis. Id.

Plaintiff returned to Dr. Rezaian on March 27, 2014 complaining of pain (R. 474). She noted the pain as a 6/10 (R. 475). After examination, Dr. Rezaian reported that Plaintiff's arthritis along with her knee, ankle, and wrist swelling remained unchanged (R. 473). Additionally he also noted that bursitis was the cause of her hip and shoulder pain. Id.

On June 24, 2014, Plaintiff met with Dr. Rezaian for pain and swelling in her hands (R. 478). Dr. Rezaian noted that Plaintiff's arthritis remained unchanged (R. 477). He also noted that inflammation was the cause of Plaintiff's low back pain and stiffness. Id.

### C. Testimonial Evidence

At the administrative hearing held on July 24, 2015, Plaintiff divulged her relevant personal and work-related facts. At the time of the hearing, she was fifty-five (55) years old, married with a twenty-six (26) year old daughter (R. 31). She has a high school diploma and has taken higher education courses through the mail to become a certified dietary manager. Id. Plaintiff last worked in 2004. Id.

From 1994 to 2004, Plaintiff worked different jobs for the State of West Virginia (R. 32). First, she worked as a general file clerk. Id. Next, she worked in the "food stamp reinvestment" field. Id. When asked to describe that job, Plaintiff stated that her duties included, "pulling files,

calling the client on the phone to see if anything had changed in their case and then recording it on paper to get to other workers" (R. 33). Following that, Plaintiff worked as a health and human services aide from 1994 to 1996. Id. Next, she worked as an economic service worker in June 1996. Id. She maintained this job until 2004 when she stopped working (R. 34). Since 2004, she has not had any other jobs nor has she applied for another job. Id. She stated that she tried to get hired by the State again, but it did not work out. Id. When asked why she left that job as an economic service worker, Plaintiff testified that it was because of her back pain and also she was getting sick all the time due to allergies and sinus infections. Id. Due to these impairments, Plaintiff claimed missing about one (1) day of work per month (R. 35). This concluded the ALJ's questioning of Plaintiff.

When questioned by her attorney, Plaintiff elaborated on her day-to-day functions once she quit working in 2004. After she quit working, Plaintiff stated that her typical day included: walking a bit because sitting too long hurts her back; checking her blood sugar; taking her medication; walking to get the newspaper; laying down in the afternoon; cleaning around the house; fixing dinner for her husband; and caring of her pets (R. 36–37). Plaintiff noted that shopping became more difficult; she stated it would take more than an hour to go grocery shopping once per week (R. 37).

Plaintiff then went on to describe her pain. In the morning, Plaintiff would have a stiff back and would have to stretch it out—she described her morning back pain as a 6/10. Id. Later, the pain would shoot to a 7–8 pain level, which forced her to lie down a lot. Id. Plaintiff testified that over the years it has gotten worse and now the pain radiates towards her hips (R. 38). Also, Plaintiff stated that her hands, which began hurting in 2009, have progressively gotten worse as well. Id. Initially, her hand pain was on average a 5/10 back in 2009. Id. When handling objects,

Plaintiff's hands swell and become rigid. Id. Picking up objects and writing have become more difficult as well. Id. To alleviate her hand pain, she either takes ibuprofen or hydrocodone (R. 39). The pain is in both hands. Id. Following testing, Plaintiff stated that she was diagnosed with arthritis (R. 40).

Plaintiff next went on to describe how the pain affected her work day. She testified that due to her back pain she would have to stand up and walk around after sitting down at her desk too long. Id. She estimated that she spent approximately two (2) hours per day at work standing and walking around (R. 41). Plaintiff then testified about all the filing she had to do at work (R. 41–43). The files weighed on average 10–15 pounds (R. 43).

Plaintiff was then asked specifically about her back pain. She stated that she was deteriorating discs (R. 44). Surgery has never been suggested for it, but even if it was Plaintiff stated that she is too afraid to have the surgery anyway. Id.

Next, Plaintiff described her arthritis and anemia issues. In 2008, Plaintiff was admitted to the hospital with a low blood count. Id. Following this, Plaintiff began suffering from fatigue, which started to improve in 2012 (R. 45). Plaintiff attributes this improvement to her regulated her blood sugar more. Id. Regarding her arthritis, she stated that her finger joints, right shoulder, and her toe joints swell on occasion. Id. Her hips hurt still along with her knees (R. 46).

When asked about her weight, Plaintiff stated that it has changed over the years. In 2009, she weighed between 208 and 210 pounds (R. 47). Due to her diabetes medication, her weight beforehand shot up to 250 (R. 48). She then proceeded to go on a diet, which helped. Id. Plaintiff then testified what would happen if she suffered low blood sugar: she could not see well; get weak; no concentration too. Id.

When asked about her resting during the day, Plaintiff stated that would have to lie down for 10 to 15 minutes before she could move again (R. 49).

About hobbies, she stated that she likes to cross-stich, but the arthritis has made it very painful to continue it (R. 50).

She also stated that she and her husband three times a year would travel to visit his family who lived 45 minutes away. Id. During the car trip, they would have to take a break so she could walk around a bit (R. 51).

Plaintiff then described how difficult shopping was. She stated that the max she could lift was 10 pounds. Id. After shopping, it would take her sometime to get physically into the car. Id. Once home, her husband had to help upload everything. Id. Following that, Plaintiff stated that she had to immediately lie down afterwards. Id.

This concluded Plaintiff's testimony.

### D. Vocational Evidence

Mr. Mark Hileman, an impartial vocational expert, also testified at Plaintiff's administrative hearing (R. 52). The VE characterized Plaintiff's work occupations from 1994 to 2000 as (1) file clerk; (2) case aide position; (3) application interviewer; and (4) eligibility worker (R. 53).

The file clerk is considered semiskilled with light demand level. Id. The case aide position was also semiskilled with a light demand level. Id. Next, the application interviewer was again semiskilled with a light demand level. Id. Finally, the eligibility worker is skilled with sedentary demand level. Id.

The ALJ then posed the following hypothetical to the VE:

Let's assume an individual who can lift up to 20 pounds occasionally, 10 pounds frequently, who can stand and/or walk about six hours, sit for over six hours of an

eight-hour day. They can never climb ladders, ropes or scaffolds, they can never—or they can occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch or crawl. They need to avoid concentrated exposure to cold and heat and hazards like moving machinery and heights. They've going to be absent from the work place occasionally with sedentary general pain, generally arthritic pain, but not more than one time a month. And they're going to need—they're going to have limitations in the manipulative area to frequent handling of objects and fingering of objects or feeling objects with their right upper extremity. Given those limitations would such an individual be able to perform the claimant's past work?

(R. 55). The VE testified that nothing within the hypothetical would prevent any of the four previous jobs because "they all require no more than frequent handling, fingering and feeling with no other issues." Id.

The ALJ then added a second set of limitations: "Let's assume the individual can stand or walk for just two of eight and sit for six out of an eight-hour day" (R. 56). The VE testified that this limitation would rule out all of Plaintiff's previous jobs except for the eligibility worker. Id.

The ALJ then added another limitation: "Let's say we changed limitations so that they could only occasionally for finger or for feel with their right upper extremity, and that's the common extremity. If we changed those manipulative limitations in that way would such an individual be able to perform that job as an eligibility worker? Id. The VE testified that the individual would not be able to. Id. When asked if other work at the sedentary level would fit those limitations, the VE said that there would be four (4) occupations that would do so. Id. The ALJ then rephrased the current hypothetical: "Are there jobs available in the sedentary level with that occasional manipulative limitation where that would allow for skills that are transferable from the claimant's skilled work that she's performed in the past?" (R. 57). The VE testified no because those jobs were unskilled or lower that could not have skills that transferred over. Id.

The ALJ then posed the last set of limitations:

Let's assume somebody who can lift up to 20 pounds occasionally and 10 pounds frequently, they can stand or walk for less than two hours, sit for less than two hours as well. That is because they're going to be—they're going to have, going to need breaks for the day, at least two extra breaks every, every 30 minutes, each lasting at least five minutes. They're going to be absent from the work place at least twice a  month and they're going to be off task, distracted from the work they're doing or at least 20 percent of the normal workday. They're going to have the postural limitations we've talked about in the prior hypotheticals. We're going to have manipulative limitations at the frequent level at a rate of—so given with these limitations would there be work in the national or regional economy?

(R. 57–58). The VE testified that there would no such work available (R. 58).

The VE testified that his testimony was consistent with the Dictionary of Occupational Titles. Id. Plaintiff's attorney had no questions for the VE. Id.

This concluded the administrative hearing.

**E. Disability Reports, Residual Functional Capacity Reports, Medical Opinions**

*1. Disability Reports*

In Plaintiff's undated disability report, she listed her medical conditions that limited her ability to work: (1) arthritis in hand joints, disc disease, low back diabetes; (2) arthritis; (3) back pain; (4) diabetes; (5) obesity; and (6) joint pain (R. 218). She reported her height as 5'2" and her weight as 230 pounds. Id. She indicated that she stopped working on April 30, 2004, because of her conditions (R. 219).

When describing her job history, Plaintiff listed four occupations: (1) economic services worker; (2) file clerk; (3) food stamp reinvestment worker; and (4) health and human service aide (R. 220).

She also listed her medications that she takes: (1) byetta; (2) Cardizem; (3) cyclobenzaprine; (4) diovan; (5) fenofibrate; (6) glimeriride; (7) hydrocodone; (8) methotrexate; (9) prevacid; and (10) welchol (R. 221).

Plaintiff then proceeded to report her medical history. She indicated having an x-ray and MRI with Dr. Lobaton (R. 222). With Dr. Rezaian, she had a blood test (R. 223). At the hospital for her overnight stay on January 23, 2009, Plaintiff had a colonoscopy and endoscopy (R. 224).

Plaintiff concluded that she cannot work because her pain and diabetes making her unable to concentrate very well, which leads her to become easily agitated with people (R. 225). Additionally, her back pain makes her unable to sit down for very long. Id.

On May 21, 2013, Plaintiff filed her first appeal disability report. She reported feeling more pain in her feet, collarbone region, shoulder, back, and hips (R. 228). She also indicated a reduced ability to walk. Id. Her medications also changed: (1) allopurinol; (2) atorvastatin; (3) fenofibrate; (4) hydrocodone; (5) kombiglyze; (6) losartan; (7) omeprazole; (8) sulfasalazine; and (9) cyclobenzatrine (R. 230). Plaintiff reported being unable to move, care for herself, or do things due to the severe pain (R. 231).

On June 18, 2013, Plaintiff filed her second appeal disability report. From her last report, Plaintiff reported no change in her conditions; although she did note that her blood sugar was been low causing her to feel weaker and have decreased eye sight (R. 236). Her medications changed once again: (1) aspart; (2) cyclobrenzaprine; (3) degluvce; (4) fenofibrate; (5) hydrocodone; (6) kombiglyze; (7) losartan; (8) sulfasalacine; and (9) vitamin D (R. 238). Plaintiff stated that she still cannot sit or stand for very long (R. 239). Additionally, she stated that she experiences stiffness in knees, ankles, and shoulders (R. 240).

## 2. Residual Functional Capacity Report

On February 28, 2013, Dr. Rezaian filled out a residual functional capacity form for Plaintiff (R. 384). In the report, he diagnosed Plaintiff with rheumatoid arthritis; he also gave her a fair prognosis. Id. He noted that Plaintiff exhibited positive symptoms for reduced range of

motion in the shoulder and spine; joint deformity; reduced grip strength weight change; tenderness; trigger points; redness; and muscle spasm. Id. He stated that Plaintiff's constant pain would interfere with her attention and concentration (R. 385). He also opined that Plaintiff could only tolerate low stress jobs. Id.

When describing her work situation, Dr. Rezaian made the following conclusions: (1) Plaintiff can sit at one time for 30–45 minutes; (2) stand for 1 hour; (3) sit/stand for less than 2 hours in a normal workday; (4) walk every 45–60 minutes a day; (5) walk each time for 5–6 minutes; and (6) take unscheduled 5 minute break every hour (R. 386–87).

Regarding her physical limitations, Dr. Rezaian opined that Plaintiff could never lift/carry 50 pounds but could occasionally lift/carry 0–20 pounds (R. 387). He also noted that Plaintiff should never stoop, crouch, climb ladders, but should rarely twist and climb stairs. Id. He further opined that she has limitations in doing repetitive reaching, handling, or fingering (R. 388). He lastly opined that Plaintiff would miss an estimated more than four days per month from work. Id.

### 3. Medical Opinions

On April 26, 2013, state-agency expert physician Dr. Porfirio Pascasio, M.D., opined that as of Plaintiff's DLI, she retained the residual functional capacity to occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand/walk, and sit, each for about 6 hours in a workday; occasionally balance, stoop, kneel, crouch, crawl, or climb ramps or stairs; and never climb ladders, ropes, or scaffolds; and she needed to avoid concentrated exposure to temperature extremes, fumes, odors, dusts, gases, poor ventilation, and hazards, such as machinery and heights (R. 76–77).

On May 24, 2013, state-agency expert physician Dr. A. Rafael Gomez, M.D., opined that Plaintiff retained the RFC to occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand/walk, and sit, each for about 6 hours in a workday; occasionally balance, stoop, kneel, crouch, crawl, or climb ramps or stairs; and never climb ladders, ropes, or scaffolds; and she needed to avoid concentrated exposure to temperature extremes, fumes, odors, dusts, gases, poor ventilation, and hazards (R. 87–88).

On May 28, 2013, Dr. Rezaian wrote a letter stating that Plaintiff suffered from rheumatoid arthritis (R. 497). He also indicated that she was disabled, but that she had a fair recovery prognosis. Id.

Dr. Lobaton on July 1, 2013, wrote a letter indicating that Plaintiff suffered from diabetes, degenerative disc disease, rheumatoid arthritis, rapid heart rate, and neuropathy (R. 499). With these medical conditions, Dr. Lobaton concluded that Plaintiff was unable to work. Id.

### III. THE FIVE STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2004). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the [RFC] of the claimant is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2015); 20 C.F.R. § 416.920 (2012). In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once this is proven, the burden of proof shifts to the Government during step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled at any of the five steps, the process will not proceed to the next step. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

## IV. THE ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2009

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of December 8, 2008, through her date last insured of December 31, 2009 (20 C.F.R. 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: degenerative disc disease; inflammatory arthritis with Reynaud's syndrome; type 2 diabetes mellitus; and obesity (20 C.F.R. 404.1520(c)).

4. Through the last date insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).

5. After consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform the exertional demands of light level work (20 C.F.R. 404.1567). However, she could only occasionally balance, stoop, kneel, crouch, crawl, or climb ropes or stairs, but could never climb ladders, ropes, or scaffolds. She could frequently handle, finger, and feel. She had to avoid concentrated (frequent) exposure to temperature extremes, vibration, hazardous or moving machinery, and unprotected heights.

6. Through the date last insured, the claimant was capable of performing past relevant work as a file clerk, a case aide, an application interviewer, and an eligibility worker. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from December 8, 2008, the alleged onset date, through December 31, 2009, the date last insured (20 C.F.R. 404.1520(f)).

## V. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a

conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1. The Commissioner erred by failing to give proper weight to the treating physicians' opinions and records (Pl.'s Br. at 10–16).

2. The Commissioner erred in finding that Plaintiff did not meet the criteria for a medical listing (Pl.'s Br. at 16–19).

The Commissioner contends:

1. Substantial evidence supports the ALJ's evaluation of the medical evidence record (Def.'s Br. at 7–11).

2. Substantial evidence supports the ALJ's evaluation of the listings (Def.'s Br. at 11–14)

### C. Substantial Evidence Does Not Support the ALJ's Analysis on Plaintiff's Treating Physicians

Plaintiff first contends that the ALJ failed to give proper weight to her treating physicians—she is referring exclusively to Dr. Rezaian and Dr. Lobaton (Pl.'s Br. at 10–16). Specifically, Plaintiff argues that no sufficient persuasive evidence exists that contradicts both

Dr. Rezaian and Dr. Lobaton's medical opinions. Id. Additionally, Plaintiff contends that the ALJ also erred by not considering Dr. Lobaton's medical opinion at all. Id. at 16.

Conversely, Defendant argues that Dr. Rezaian's medical opinion was inconsistent with the rest of the evidence (Def.'s Br. at 7–9). Discussing Dr. Lobaton, Defendant states that any error by the ALJ concerning this opinion was harmless because the outcome of this case would have not been changed regardless. Id. at 9–11.

In his decision, the ALJ afforded Dr. Rezaian's medical opinion "very little weight" (R. 20). The ALJ reasoned that Dr. Rezaian gave "no specific rationale or symptoms" and that his restrictions regarding Plaintiff "are not supported by his own treatment records . . . ." Id. The ALJ also commented that Dr. Rezaian seemed to base his opinion only on Plaintiff's subjective complaints. Id. This was the ALJ's only analysis on Plaintiff's treating physicians—Dr. Lobaton is not mentioned at all in the ALJ's decision.

The regulations, specifically 20 C.F.R. § 404.1527(c), discuss how the ALJ weighs treating source medical opinions:

> *How we weigh medical opinions*. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
>> (1) *Examining relationship*. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>> (2) *Treatment relationship*. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

> (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it. See Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Such opinions should be accorded great weight because they "reflect[] an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983). In Craig v. Chater, however, the Fourth Circuit further elaborated on this rule:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

76 F.3d 585, 590 (4th Cir. 1996). In addition, "[n]either the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary." DeLoatch v.

Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983). Thus, "[t]he treating physician rule is not absolute." See Hines v. Barnhart, 453 F.3d 559, 563 n.2 (4th Cir. 2006).

Some issues are reserved specifically for the Commissioner and opinions on such issues "are never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). For example, the Commissioner is responsible for determining whether a claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Therefore, a medical source that offers an opinion on whether an individual is disabled or unable to work "can never be entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL 374183, at *5.

The Fourth Circuit has also noted that a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). An ALJ's failure to do this "approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977) (quoting Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974)).

### 1. Dr. Rezaian

Per the rule in Craig, if the treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques *and* is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight." Craig, 76 F.3d at 590 (emphasis added). The undersigned finds that Dr. Rezaian used acceptable medical clinical techniques when evaluating Plaintiff; yet, the undersigned also finds that his opinion is inconsistent with his own treatment notes. For example, as the ALJ noted when dissecting

Plaintiff's treatment record, Plaintiff's physical examinations revealed "normal range of motion, motor strength, and gait" along with "no significant evidence of neurologic compromise which would affect [Plaintiff's] ability to stand, walk, or sit . . . " (R. 18–19, 270, 274, 277, 281, 285, 291, 313–17, 322, 326, 330, 335, 341). Yet, this seemingly contradicts Dr. Rezaian's opinion on Plaintiff's condition (R. 386–87, 497). Additionally, the undersigned also notes that Plaintiff never had—nor was even recommended—surgery to correct her pain and that other doctors also concluded the same findings the ALJ used in his analysis (R. 44, 422). Although Plaintiff would have some episodes of decreased range of motion and gait—which would return to normal levels at other appointments—the undersigned therefore finds that Dr. Rezaian's opinion is inconsistent with his treatment notes and hence does not merit controlling weight.

Although Dr. Rezaian's opinion is not entitled controlling weight, the opinion may not be summarily dismissed on that basis but instead must be evaluated "in light of the entire record to determine the extent to which the [treating physician's legal conclusion] is supported by the record." Morgan v. Barnhart, 142 F.App'x 716, 723 (4th Cir. 2005) (quoting SSR 96-5p, 1996 WL 374183, at *3). The ALJ must therefore consider the factors from the regulations to determine what weight to afford the opinion. See 20 C.F.R. § 404.1527(c)(1–6). However, the ALJ does not have to list and address each factor in his or her opinion. See, e.g., Beland v. Comm'r of Soc. Sec., No. 1:14cv138, 2015 WL 5169112, at *4 (N.D. W. Va. Sept. 1, 2015).

In his analysis, the ALJ notes that Dr. Rezaian "gives no specific rationale or symptoms accounting for his restrictions, which are not supported by his own treatments records . . ." (R. 20). Under the regulations, consistency and supportability are two of the factors that the ALJ can consider when determining what weight to give an opinion. See 20 C.F.R. § 404.1527(c)(3–4) ("The better an explanation a source provides for an opinion the more weight we will give that

opinion . . . . Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion"). While Dr. Rezaian is a rheumatologist, which under the regulations entitles him to more deference, the undersigned nonetheless finds that, viewing the record as a whole, the ALJ provided sufficient reasons for assigning little weight to Dr. Rezaian's medical opinion and therefore holds that substantial evidence supports the analysis.

### *2. Dr. Lobaton*

The ALJ erred when it completely disregarded Dr. Lobaton's medical opinion without providing any sort of analysis on why he did so. As the regulations state, an ALJ must "evaluate *every* medical opinion we receive." 20 C.F.R. § 404.1527(c) (emphasis added). Yet, in his decision, any mention of Dr. Lobaton, who treated Plaintiff for some time, is conspicuously absent. There is no mention of any weight given to her opinion or even acknowledging the existence of her medical opinion at all for that matter. Invoking the rule from Gordon, how can this court "determine if findings are supported by substantial evidence unless the Secretary explicitly indicate[d] the weight given to all of the relevant evidence"? Gordon, 725 F.2 at 235. Much like in DeLoatche v. Heckler, the Fourth Circuit remanded the case there because the ALJ—exactly like here—failed to explain why the treating physicians' opinions were disregarded. See DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983) ("The Secretary must present us with findings and determinations sufficiently articulated to permit meaningful judicial review"). Without an adequate explanation of a decision by the ALJ, "[j]udicial review of an administrative decision is impossible." Id.

Besides Defendant's harmless error[3] argument, it also argues that Dr. Lobaton's opinion should have been disregarded, regardless, because it opined on issues reserved only for the Commissioner. The Court does, partly, agree with that assertion. As stated previously, only the Commissioner is responsible for determining whether a claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Therefore, a medical source that offers an opinion on whether an individual is disabled or unable to work "can never be entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL 374183, at *5. Dr. Lobaton opined that Plaintiff cannot work anymore (R. 499). Therefore, Dr. Lobaton's opinion is not entitled to controlling weight—this does not end the analysis though.

Just because an opinion is not controlling does not mean it can be unequivocally disregarded. As per the regulations, the ALJ, because such medical opinions opining on disability issues are not controlling, should have then conducted a sequential analysis using the six factors to determine what weight to afford Dr. Lobaton's opinion. See 20 C.F.R. § 404.1527(c)(1–6) (the ALJ will look at examining relationship, treating relationship, supportability, specialization, and consistency); see also Burch v. Apfel, 9 F.App'x 255, 259 (4th Cir. 2001). Failure to do so constitutes reversible error. See Perine v. Astrue, No. 1:08cv176, 2009 WL 2045038, at *21 (N.D. W. Va. July, 9, 2009).

Because the ALJ failed to state the reasons in his decision why he completely disregarded Dr. Lobaton's medical opinion thus making judicial review difficult if not "impossible," the undersigned finds that remand is necessary for further consideration on this issue.

---

[3] The undersigned cannot confidently conclude that the ALJ's failure to mention Dr. Lobaton's medical opinion was harmless without some reason from the ALJ as to why the opinion was disregarded as a whole in the first place. See Marsh v. Colvin, 792 F.3d 1170, 1173 (9th Cir. 2015); Bowen v. Comm'r of Soc. Sec., 478 F.3d 742, 749–50 (6th Cir. 2007). The Court highlights that Dr. Lobaton was not some doctor Plaintiff visited on one occasion—Plaintiff has a treating history with Dr. Lobaton and has seen her multiple times.

### D. Plaintiff Does Not Meet the Criteria for Listings 14.09 and 1.04

Plaintiff next contends that the ALJ erred by not classifying her impairments as a medical listing (Pl.'s Br. at 16–19). Specifically, Plaintiff asserts that she meets the criteria for medical listing 14.09, inflammatory arthritis, and medical listing 1.04, disorders of the spine. Id. Defendant, on the other hand, counters arguing that no evidence supports Plaintiff meeting either of those medical listings (Def.'s Br. at 11–14).

In his decision, the ALJ concluded that Plaintiff's impairments did not meet the criteria for any listings (R. 16). Focusing on medical listings 1.04 and 14.09, the ALJ reasoned that Plaintiff did not meet either listing because "repeated physical examinations failed to show any motor, reflex, or sensory loss," and that there was "no evidence of the ineffective ambulation or inability to perform fine and gross movements . . . ." (R. 17).

The listings under the regulations, located at Appendix 1, Subpart P of Part 404, are "descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect" with each impairment "defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 529–30 (1990). Used as a regulatory device, the listings quicken the decision-making process to identify claimants whose impairments are so severe that they would be found disabled regardless of the vocational background. Id. at 532. Yet, no matter how severe or troublesome Plaintiff's symptoms may be, "to show that h[er] impairment matches a listing, it must meet *all* of the specified medical criteria." Id. at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify"). This is a high standard to meet but it was purposefully made this way. See id. at 532 ("The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard").

*1. Medical Listing 14.09 Inflammatory Arthritis*

In general, inflammatory arthritis requires a history of join pain, swelling, and tenderness resulting in either the inability to ambulate effectively or perform fine and gross movements. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00(D)(6)(a). The regulations define the inability to ambulate to mean an "extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." Id. at § 1.00b(1) ("Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities"); see also id. at § 1.00b(2) ("To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. . . . examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes . . . ."). The regulations also define the inability to perform fine and gross movements as an "extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." Id. at § 1.00c ("examples of inability to perform fine and gross movements effectively include . . . the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level").

To specifically qualify under medical listing 14.09, one of the following criteria must be fulfilled:

> A. *Persistent inflammation or persistent deformity of*: 1. One or more major peripheral weight-bearing joints resulting in the inability to ambulate effectively (as defined in 14.00C6); or 2. One or more major peripheral joints in each upper extremity resulting in the inability to perform fine and gross movements

effectively (as defined in 14.00C7). OR B. *Inflammation or deformity in one or more major peripheral joints with*: 1. Involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity; and 2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss). OR C. *Ankylosing spondylitis or other spondyloarthropathies, with:* 1. Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 45° or more of flexion from the vertical position (zero degrees); or 2. Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 30° or more of flexion (but less than 45°) measured from the vertical position (zero degrees), and involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity. OR D. *Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs* (severe fatigue, fever, malaise, or involuntary weight loss) *and one of the following at the marked level*: 1. Limitation of activities of daily living. 2. Limitation in maintaining social functioning. 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

Id. at § 14.09 (emphasis added). Although Plaintiff does not specifically specify what subsection of listing 14.09 she qualifies under, based upon her motion for summary judgment the undersigned believes she is referring to subsection A (Pl.'s Br. at 16).

Regarding the ability to ambulate element, Dr. Rezaian in his residual functional capacity report did not see the need to require Plaintiff to use a walking assistance device (R. 387). Additionally, he also stated that Plaintiff must be allowed to take breaks every hour during the work day so she could walk around for a specified time period (R. 386–87). As the ALJ noted, Plaintiff herself testified that she would walk around the house cleaning, fixing dinner, and taking care of the pets; she also stated that she would have to walk, albeit slowly, when she shopped for groceries and such (R. 18, 36–37, 49). Thus, the undersigned agrees with the ALJ that Plaintiff's ability to "carry out [these] activities of daily living" along with the absence of a walking device does not meet the threshold for the "inability to effectively ambulate" criterion. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(b)(1–2).

Turning to the fine and gross movements element, objective medical evidence shows that Plaintiff did not suffer from an "extreme loss of function of both upper extremities." See id. at § 1.00c. Dr. Lobaton concluded that Plaintiff's motor and sensory function remained intact, and Dr. Rezaian also concluded that Plaintiff had good coordination and sensation as well (R. 270, 274, 277, 281, 285, 291, 313, 316, 321, 236, 330, 335, 340). Plaintiff also testified that she could still make meals for her husband and, as part of her job before she quit due to back pain, handle files and place them in a filing cabinet (R. 18, 36, 41–44). Viewing these together, the undersigned agrees with the ALJ and finds that Plaintiff did not have the inability to perform fine and gross movements. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00c.

Accordingly, the undersigned finds based upon the record that Plaintiff does not meet the qualifications under medical listing 1.04 for inflammatory arthritis and thus finds that substantial evidence supports the ALJ's analysis here.

## 2. Medical Listing 1.04 Disorders of the Spine

Listing 1.04, disorders of the spine, requires compromise of a nerve root (which includes cauda equina) or compromise of the spinal cord along with evidence of one of the following:

> A. *Evidence of nerve root compression* characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); B. *Spinal arachnoiditis*, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or C. *Lumbar spinal stenosis* resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 (emphasis added). Some examples of disorders of the spine, as delineated in the regulations, include "herniated nucleus pulposus, spinal arachnoiditis,

spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture." Id. Although Plaintiff again does not specify what subsection she qualifies under, based upon her motion the undersigned believes she is referring to subsection A (Pl.'s Br. at 18).[4]

Reviewing the needed requirements, it is clear that Plaintiff does not meet *all* of them for subsection A. See Sullivan, 493 U.S.at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify"). Subsection A requires, along other things, "limitation of motion of the spine [and] motor loss." See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. The medical evidence, as the ALJ noted, does not lead to a finding of either motor loss or limited range of motion. Dr. Rezaian when examining Plaintiff did note that she suffered from a limited range of motion in her joints—specifically her ankle, knees, shoulders, and wrists—but she never did suffer from a limited range of motion in her spine (R. 17, 313, 316, 322, 326, 330, 335, 341). In addition, Dr. Lobaton also found that Plaintiff had intact motor function, which is something the ALJ noted in his analysis (R. 17, 270, 274, 277, 281, 291). Accordingly, Plaintiff has failed to satisfy all the requirements of subsection A.

Therefore, Plaintiff does not meet medical listing 1.04 and the undersigned hence finds that substantial evidence supports the ALJ's analysis here.

## VI. RECOMMENDED DECISION

Nonetheless, I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED,** and Plaintiff's Motion for Summary Judgment be **GRANTED** and this matter be **REMANDED** for further consideration on the specific issues set forth within.

---

[4] Plaintiff does not qualify under subsection B because there is no evidence of her suffering from spinal arachnoiditis. Furthermore, she does not qualify under subsection C because it requires the inability to effectively ambulate, which as previously discussed, is not applicable here.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.  28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 22nd day of December, 2015.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE